JACK LITTLE FOUNDATION FOR AID TO THE DEAF v. JONES et al.

Civ. No. 4994.

United States District Court
W. D. Oklahoma.

Dec. 10, 1951.

Charles R. Nesbitt, Oklahoma City, Okl., for plaintiff.

Robert E. Shelton, U. S. Atty. Oklahoma City, Okl., for defendant and intervener.

WALLACE, District Judge.

This is an action by The Jack Little Foundation for Aid to the Deaf, a corporation, against H. C. Jones, Collector of Internal Revenue for the District of Oklahoma, to recover income taxes which plaintiff paid on income reported for the fiscal years ending January 31, 1948, and January 31, 1950, on the ground that it is a tax exempt corporation. The United States intervened, seeking to recover from plaintiff the balance of taxes due on the reported income for the two years in controversy.

The parties to the suit submitted the case to the court for decision upon the following material facts which were stipulated to.

Reuel W. Little for many years has been an attorney at law, and at and prior to December 21, 1946, he was so engaged at Madill, Oklahoma. On the date just mentioned, he was the owner of a 110 acre tract of land bordering on Lake Texoma, near Madill. The land at that time was unimproved.

The Jack Little Foundation for Aid to the Deaf (hereinafter referred to as the Foundation), was incorporated on December 21, 1946, under the laws of the State of Oklahoma. The Articles of Incorporation were duly filed with the State to form a charitable organization, and a Certificate of Incorporation was issued by the Secretary of State on December 28, 1946. The Articles of Incorporation provided in part:

\* \* \* \* \* \*

"The purpose for which this corporation is formed is to acquire and hold such property for the purpose of performing its function in assisting those that are deaf. It shall sponsor all kinds of assistance to the Deaf and particularly furnish a summer camp for the Deaf and schooling and aid and assist others in their efforts to assist the Deaf in their efforts to lead normal and happy lives.

\* \* \* \* \* \*

"The term for which this corporation shall exist shall be perpetual."

\* \* \* \* \* \*

The Articles then provided that the corporation would be managed by three trustees to serve until their successors were chosen. The three trustees elected to begin the corporation were Reuel W. Little; Oteka Little; and Mary C. Little.

Immediately after incorporation of the Foundation, Reuel W. Little and his wife, Oteka Little, deeded to the Foundation the 110 acres of land bordering on Lake Texoma, hereinabove referred to, as the site for the summer camp mentioned in the Articles of Incorporation.

After incorporation an application was made to the Commissioner of Internal Revenue for a ruling that the Foundation would be exempt from Federal income tax under the provisions of Section 101(6) of Title 26 U.S.C.A. The application contained information to the effect that the Corporation was organized to render aid to the deaf, that there was no capital stock, and that in the event of dissolution all assets would go to carry out the purpose of the Corporation. On February 26, 1947, the Commissioner, by E. I. McLarney, Deputy Commissioner, wrote the Foundation a letter to the effect that if the Corporation operated strictly in accordance with the stated purpose of the Corporation that it would be exempt from Federal income tax under the provisions of Section 101(6) of the Internal Revenue Code.

Shortly after receipt of the letter from the Commissioner advising the Foundation that it was exempt if operated in accordance with its stated purpose, the transactions took place which were later considered by the Commissioner to take the Foundation out of the classification of an exempt corporation. These transactions are set out in the first five paragraphs immediately following.

On or about April 25, 1947, J. C. Hammill entered a bid for buildings being sold by the War Assets Administration from the Dalhart Army Air Field, Dalhart, Texas. On May 13, 1947, Mr. Hammill was notified that he was the successful bidder on some 120 buildings, at a total cost of $41,067.60. On May 14, 1947, Hammill assigned all his right, title and interest in this contract and in the property involved therein to the Foundation, since he had at

all times been acting as agent for the Foundation in the transaction. The buildings to which this bid was related were all sold between May 15, 1947, and August 6, 1947.

On July 15, 1947, additional buildings at Dalhart were offered for sale and the Foundation, through Ernest E. Ayres, a partner of the Foundation in the transaction, purchased 27 additional buildings at a cost of $8,384, which buildings were sold on or before August 17, 1947.

On or before October 7, 1947, Ernest E. Ayres, as agent for and partner of the Foundation, entered a bid on buildings offered for sale at South Camp Hood, Texas. He was notified on October 7, 1947, that he was the successful bidder on 16 buildings, at a total cost of $4,490. These buildings were all sold on or before November 8, 1947.

On October 23, 1947, the Foundation became the successful purchaser of some 667 buildings at Camp Livingston, Alexandria, Louisiana, at a total cost of $99,206. These buildings were all sold on or before February 11, 1948.

In November, 1948, the Foundation became the successful bidder and purchaser of certain buildings located at the Reno Air Force Base, Reno, Nevada, at a total cost of $92,912.27, which buildings were sold during the remainder of 1948 and during the calendar years 1949 and 1950.

During the period from April, 1947, to November, 1948, Reuel W. Little was the successful bidder in his own name on buildings at other locations where the War Assets Administration was conducting sales of surplus buildings; disposition of items purchased on his individual account were being carried on at the same time disposition was being made of purchases for the account or in the name of the Foundation. It appears from the evidence that the accounts of Reuel W. Little and the accounts of the Foundation were kept separately and in good order. There is no evidence that there was any fraud or colored transactions to indicate that the Foundation's transactions were being used as a cover for the personal investments of Reuel W. Little.

On January 7, 1948, the Articles of Incorporation of the Foundation were amended to add as a further purpose for its organization, the following: "Also to furnish the necessary funds, including transportation, hospitalization, drugs and medical supplies and doctor bills, to repair harelips and cleft palates on children or grown people of any age, and to that end to acquire, hold, mortgage and sell, such property, real and personal, as may be deemed necessary."

The Foundation had established as a fiscal year a twelve month period ending January 31st of each year, and it filed information returns on Treasury Form 990 for the fiscal years ending January 31, 1948, 1949 and 1950. However, on January 23, 1950, the Commissioner of Internal Revenue, by E. I. McLarney, Deputy Commissioner, notified the Foundation of the Commissioner's decision that the Foundation was engaged in activities which would prevent its being qualified as exempt under Section 101(6) of the Internal Revenue Code. Reference was made to the transactions concerning the surplus buildings purchased and resold by the Foundation and the Bureau ruling of February 26, 1947, was revoked. There was also a ruling by the Commissioner that the Foundation file Federal income tax returns on Form 1120. Following this letter from the Commissioner, the Foundation, through its trustee, Reuel W. Little, replied to the Commissioner's letter and sought a reconsideration of the Foundation's status. On April 4, 1950, the Commissioner, by E. I. McLarney, Deputy Commissioner, affirmed the ruling previously made.

Thereafter on May 24, 1950, the Foundation filed a corporate income tax return for each of the fiscal years ending January 31, 1948; January 31, 1949; and January 31, 1950, on Treasury Form 1120. The tax return for the year ending January 31, 1948, showed a tax liability of $16,546.65, the return for the year ending January 31, 1949, showed a net loss with no tax liability, and the return for the year ending January 31, 1950, showed a tax liability of $564.96.

With the return for the fiscal years ending January 31, 1948, and 1950, the Foundation remitted on account $250 for each of the tax years. On the same day that the returns were filed and the payments of $250 on each of the two years were made, the Foundation filed claims for refund for each of the two years on the regular Treasury Form 843. No action was taken by the Collector, H. C. Jones, nor by the Commissioner of Internal Revenue, for a period of six months. After the elapse of this time, this suit was filed for a return of the taxes paid.

In May, 1950, after returns were filed as set out above, the Commissioner of Internal Revenue, in respect of the fiscal year ended January 31, 1948, assessed income tax of $16,546.65, penalty (for late filing of return) of $4,136.66, and interest of $2,151.75; a total of $22,835.06. In respect of the fiscal year ended January 31, 1950, the income tax assessed was $564.96; penalty (for late filing of return) of $56.50, and interest of $7.62; a total of $629.08. Except for the payments remitted at the time the returns were filed, no part of the taxes, penalty or interest assessed has been paid, though payment was demanded by the Collector of Internal Revenue.

On or about June 9, 1950, the Foundation filed an Affidavit of Delinquency for the fiscal years ending January 31, 1948, and January 31, 1950.

Since the inception of the organization, the summer camp has been constantly added to and the camp now consists of several buildings and numerous recreational facilities. In the operation of the camp, those who are able to pay do so, others are sponsored by civic groups, while still others have all expenses paid by the Foundation. All of the facilities have been devoted to work with deaf children during the summer sessions although the camp has been rented at various times to civic, church, and other similar organizations. Since the amendment to the Articles of Incorporation, the Foundation has also supplied medical aid to a number of persons afflicted with cleft lips and cleft palates. The Foundation bears the expenses and doctor bills for the patients on the basis of actual services rendered. The only salaries paid by the Foundation have been to the caretaker of the camp and to the professional people engaged in rendering aid to the deaf and to those afflicted with cleft lips or palates. No officer or trustee of the Foundation has received any compensation whatsoever and any service they have rendered has been gratuitous. The camp manager also donates his services to build up, direct, and supervise the camp and its operations.

It was specifically stipulated by the parties to this suit that:

"For the purposes of this litigation, it is agreed that all of the net income of the Foundation, whether derived from sale of surplus buildings or other sources, was used or expended for Foundation purposes, that is, the operation of a summer camp for deaf children, and medical aid for correction of cleft lips and palates.

"It is agreed that no part of the activities of the Foundation during the period covered by this stipulation has been carrying on propaganda or attempting to influence legislation.

"For the purposes of this litigation it is agreed that no part of the net income of the Foundation has inured to the benefit of any private individual or trustee."

Although it was not specifically stipulated to, the United States in its brief assumed the position and conceded that the Foundation was "organized" exclusively for charitable purposes, however it has taken the position that the Foundation was not "operated" exclusively for charitable purposes. [1]

The applicable law is contained in the Internal Revenue Code, 26 U.S.C.A. § 101, and Treasury Regulations 111, § 29.101(6)–1. The statute and regulations involved have been carefully considered in a number of cases and nothing more could be gained by rephrasing in different words a rather well settled principle already established by the cases.

1. Page 9, Brief of the Defendant and the United States.

The United States relies mainly upon the cases of Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67; Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451, certiorari denied, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623, rehearing denied, 340 U.S. 894, 71 S. Ct. 204, 95 L.Ed. 648; United States v. Community Services, Inc., 4 Cir., 189 F.2d 421; and upon § 117 of the Revenue Act of 1943, c. 63, 58 Stat. 21, 26 U.S.C.A. § 54 and the Revenue Act of 1950, Public Law 814, 71st Cong. 2d Sess., 26 U.S.C.A. Int.Rev.Acts.

An examination of the cases relied upon by the defendant and the United States clearly shows that those cases are not applicable to the case now before the court. A perusal of those cases discloses either that the corporation involved was not organized exclusively as a charitable organization or that private individuals were recipients of the benefits and profits made. Nor can the contention that the Revenue Acts of 1943 and 1950 support their position in the light of a recent case which will hereinafter be referred to.

On the other hand, the plaintiff places great reliance upon the much discussed and often cited case of Roche's Beach, Inc., v. Commissioner of Internal Revenue, 2 Cir., 96 F.2d 776. Another decision which is perhaps the classic case in this field of litigation is the decision of the Supreme Court of the United States in the case of Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458. This latter case is also heavily relied upon by the plaintiff.

In the final analysis and in light of the stipulations agreed to by the United States, there is but one issue to decide and that is, was The Jack Little Foundation for Aid to the Deaf "operated" exclusively for charitable purposes? The United States has taken the stand that the taxpayer was engaged in trade and selling to the public; thus cannot be considered as operating exclusively for charitable purposes. This precise issue has arisen in many cases where charitable corporations sought exemption from Federal income taxes, and in every case where the corporation was "organized" exclusively for charitable purposes and all of the money earned by the corporation from whatever source was used for the furtherance of the purpose of the charity, the courts have unanimously held for the charitable organization.

All of the contentions that the United States has advanced and the cases cited to support its position in this case were adequately considered in the recent case of. C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 190 F.2d 120, 122. This case is even stronger for the position of the plaintiff since it clearly appears from the stipulations that the transactions of the Foundation were sporadic and few in number, although very profitable, and that the Foundation took advantage of an opportunity to earn substantial funds for carrying on the charitable work for which it was organized.

The Mueller case followed a line of decisions which are cited in the opinion. In accordance with the Mueller case and the cases cited therein, this court finds that the plaintiff, The Jack Little Foundation for Aid to the Deaf, was a tax exempt corporation under the provisions of § 101 (6) of the Internal Revenue Code for the periods involved in this litigation, and that the plaintiff is entitled to receive a refund of the taxes paid for the fiscal years ending January 31, 1948, and January 31, 1950.

Counsel are directed to submit a journal entry in conformity with this opinion within ten days from this date.